# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

RICHARD REYNOLDS, et al.,
    Plaintiffs,

    v.

ROLLIN COOK, et al.,
    Defendants.

No. 3:13-cv-388 (SRU)

## MEMORANDUM OF DECISION

Before 2012, inmates in Connecticut's prisons could order sexually explicit publications, such as *Playboy*, and prisoners often ordered them. As a result, Connecticut's prisons contained large amounts of sexually explicit pictorial depictions. In 2012, the Connecticut Department of Correction ("DOC") implemented a revised version of Administrative Directive 10.7 ("A.D. 10.7"), which governed inmate communications, including incoming publications. The 2012 revision to A.D. 10.7 redefined pictorial sexually explicit material—to include both sexual activity and nudity—and banned that material unless it was "literary, artistic, educational, or scientific in nature." I will refer to that revision as the "2012 ban." Numerous prisoners challenged the constitutionality of the 2012 ban under both the United States and Connecticut Constitutions. Because the 2012 ban is constitutional under the United States Constitution, I shall enter judgment in favor of the Defendants. The Plaintiffs' state law claims are not properly before me and so I dismiss those claims without prejudice; if the Plaintiffs wish to pursue those claims, the proper venue to do so would be in state court. The following constitutes my findings of fact and conclusions of law.

## I.      Procedural Background

I held a two-part bench trial in this matter. The first part was a two-day bench trial in January 2015 in *Akov Ortiz v. Leo C. Arnone*, No. 3:11-cv-1793 (SRU) ("*Ortiz*"). In *Ortiz*, four witnesses testified: Akov Ortiz, Eileen Redden, Robert Harnett, and Monica Rinaldi. The second part was a three-day bench trial in April 2019 in this case. In this case, thirteen witnesses testified: Richard Reynolds, Dwight G. Pink, Andre R. Sosa, Eileen Redden, John Vivo III, Victor Smalls, Robert Selverstone, Robert Hartnett, Julie Kunkel, David McNeil, Anne Cournoyer, Jose Rivera, and Rollin Cook.

This matter is the lead case into which five other matters have been consolidated. First, in May 2015, I consolidated three cases into this matter: (1) *Kenya Brown v. Leo C. Arnone*, No. 3:13-cv-902 (SRU); (2) *Andres R. Sosa v. Leo C. Arnone, et al.*, No. 3:14-cv-318 (SRU); and (3) *Dwight G. Pink v. Leo C. Arnone, et al.*, No. 3:14-cv-993 (SRU). In September 2015, I consolidated *Ortiz* into this case and ordered that the record from *Ortiz* would become part of the record in this case. *See Ortiz*, Conf. Mem. and Order, Doc. No. 93. And in June 2017, I consolidated another case—*Victor Smalls v. Scott Simple, et al.*, No. 3:17-cv-119 (SRU)—into this case. In this consolidated case, there are seven plaintiffs, all state prisoners in the custody of the DOC (the "Plaintiffs"): Ortiz, Brown, Sosa, Pink, Smalls, Reynolds, and Vivo. The Plaintiffs have been in DOC custody at all times relevant to this case; none was convicted of a sex offense.[1]

---

[1] Ortiz has been incarcerated since 1999 and has resided at Hartford Correctional Center, MacDougall-Walker Correctional Institution ("MacDougall-Walker"), Northern Correctional Institution ("Northern"), Garner Correctional Institution, and Cheshire Correctional Institution ("Cheshire"). *See Ortiz* Trial Tr., Doc. No. 79, at 11:13–12:7. At the time of his trial, Ortiz was confined at Cheshire. *See id.* at 12:9. Reynolds, incarcerated since 1992, has spent 24 years at Northern and was confined there at the time of trial. Trial Tr., Doc. No. 154, at 6:10–13. Pink, who has been incarcerated for over 19 years, was confined at Cheshire at the time of trial and had been there since at least 2012. *See id.* at 76:16–21. Sosa has been incarcerated since November 1997; he was at MacDougall-Walker in 2012 and was at Cheshire at the time of trial. *See id.* at 106:13–20. Vivo, who has been incarcerated since around 1994, was confined at Cheshire both in 2012 and at the time of trial. Trial Tr., Doc. No. 155, at 275:11–17. Smalls, incarcerated around 2007, had been confined in Northern, MacDougall-Walker, Manson Youth Institution, Corrigan-Radgowski Correctional Center ("Corrigan"), and Bridgeport Correctional Center. *See id.* at

The Plaintiffs allege violations of their rights under the First and Fourteenth Amendments to the United States Constitution, Art. 1, Sections 4 and 5 of the Constitution of the State of Connecticut, and unlawful application of an invalid regulation under Connecticut law. *See* Second Am. Compl., Doc. No. 110, at ¶¶ 48–60.

## II.    Facts

### A. Before 2012

Apparently, before 2002, DOC inmates could receive publications containing "hardcore" sexually explicit pictorial material. As Ortiz explained, "hardcore" refers to visible depictions of "penetration, secretion, [and sex acts with] multiple partners." *Ortiz* Trial Tr., Doc. No. 79, 75:21–24; Trial Tr., Doc. No. 155, at 403:16–17 (Hartnett defining "hardcore" as depictions of "actual sexual penetration, ejaculation, contact between genital to genital, genital to oral"). In contrast, "softcore" refers to visible depictions of nudity—including breasts and genitalia— without secretions or penetration. *See Ortiz* Trial Tr., Doc. No. 79, at 76:8–77:13 (Ortiz). Ortiz reported that between 1999 and 2002, he subscribed to numerous "hardcore" pornographic magazines. *See id.* at 15:3–22. Ortiz explained that "hardcore" pornographic material was "rampant" in his facility between 1999 and 2002. *See id.* at 14:19. Other witnesses confirmed that "hardcore" pornographic material was ubiquitous. *See, e.g.*, *Ortiz* Trial Tr., Doc. No. 80, at 161:8–12 (Hartnett confirming that "like Mr. Ortiz said yesterday, it was everywhere").

In 2002, according to Ortiz, the DOC altered its regulations (or changed its enforcement strategy) so that inmates could no longer receive "hardcore" materials, but it did not proactively confiscate inmates' existing "hardcore" materials. *See Ortiz* Trial Tr., Doc. No. 79, at 16:15–

---

302:11–16. In 2012, Smalls was confined at Northern; and at the time of trial, Smalls was confined at Corrigan. *See id.* at 302:17–20. Brown, who did not testify in either trial, was confined at Corrigan at the times relevant to this case and was confined at Cheshire at the time of trial. *See* Second Am. Compl., Doc. No. 110, at ¶ 9.

19.[2]  Still, the DOC allowed "softcore" pornographic materials, such as *Playboy* and *Penthouse*, into its facilities.  *See id.* at 16:20–17:10; 35:13–25.  As a result, even after 2002, both "hardcore" and "softcore" sexually explicit materials were still ubiquitous in DOC facilities.  *See, e.g.*, Trial Tr., Doc. No. 155, at 329:19–24 (Sosa acknowledging that at Northern from 2007 to 2010 some inmates ordered "hundreds, if not thousands, of pictures"); *id.* at 293:2–23 (Vivo testifying that, before 2012, he kept 2,500 nude photos in a manila envelope).  Although administrative directives prohibited inmates from displaying in public view sexually explicit pictorial depictions, Commissioner Arnone wrote in 2011 that "sexually explicit pictures are still found inside inmate lockers and displayed in other areas of correctional facilities where staff is exposed to them."  *See* Arnone Mem., Defs.' Ex. C, at 20 (citing Administrative Directive 6.10); *see also* Administrative Directive 2.2, Defs.' Ex. S, at ¶ 5F (defining as sexual harassment the "[d]isplay in the workplace of sexually suggestive objects, pictures, or photographs").

Even though it was against prison rules for prisoners to display sexually explicit pictorial depictions on their wall space or to store it in their lockers, in practice, it happened all the time.  *See, e.g.*, *Ortiz* Trial Tr., Doc. No. 79, at 16:1–7 (Ortiz explaining that even though "it's not allowed," prisoners posted sexually explicit materials on their cell walls); Trial Tr., Doc. No. 156, at 510:4–20 (Cournoyer, a former Warden at Enfield Correctional Institution, describing how, when she was a corrections counselor at Somers Prison (now Osborn Correctional

---

[2]  Even though Ortiz's testimony indicates that in 2002 the DOC began banning "hardcore" pornographic materials, there is no other testimony confirming that ban.  Indeed, other evidence in this case indicates that the version of A.D. 10.7 preceding the 2012 ban allowed the DOC to refuse a communication containing sexually explicit material only if "it is sexually explicit material which by its nature or content poses a threat to the security, good order, or discipline of the facility, or facilitates criminal activity.  A Unit Administrator or designee shall determine that sexually explicit material of the following types is to be excluded: (1) sado-masochistic; (2) bestiality; (3) involving children; or (4) materials depicting sexual activity which involves use of force or without the consent of one or more parties."  Garnett Aff., Defs.' Ex. O, at ¶ 5.  Thus, it seems that DOC regulations allowed "hardcore" pornography into its institutions until the 2012 ban.  Either way, all parties agree that both "hardcore" and "softcore" sexually explicit materials were ubiquitous in DOC facilities as of 2012.

Institution) from 1992 into the 2000s, sexually explicit pictorial depictions were "pervasive"); Trial Tr., Doc. No. 155, at 402:21–403:5 (Hartnett recounting finding such materials in an inmate's "foot locker, wall locker, on his bed, under his bed," and "posted to the back of the door"); *Ortiz* Trial Tr., Doc. No. 80, at 193:24–25 (Hartnett recalling that inmates used to cover their TVs with sexually explicit material).

As one might imagine, and as Deputy Commissioner Monica Rinaldi explained, the ubiquity of sexually explicit pictorial depictions created "a very sexually charged environment." *Ortiz* Trial Tr., Doc. No. 80, at 251:23. Eileen Redden, who was employed at the time of the *Ortiz* trial as the DOC's Durational Program Manager (her job duties included overseeing the DOC's sex offender treatment program), recalled visits to Northern during which she "often observed pornographic images of women exposing their vaginas . . . taped on [the] windows [of inmates' cells] facing outward so the female staff was forced to look at them." Redden Aff., Defs.' Ex. N, at ¶ 16. Some inmates also acknowledged that DOC facilities were not pleasant environments in which to work, especially for female staff. *See, e.g.*, Trial Tr., Doc. No. 155, at 326:5–8 (Smalls acknowledging as much).

Both before and after 2012, "gunning" has been an unfortunately common practice in DOC facilities. "Gunning" refers to an inmate's masturbating (often to ejaculation) in view of a (usually female) DOC staff member. *See, e.g.*, Trial Tr., Doc. No. 154, at 29:10–18; 34:6–11 (Reynolds describing the practice); *id.* at 112:21–117:25 (Sosa describing the practice and his personal involvement with it); *see also* Disciplinary Reports, Defs.' Ex. V.

Several DOC employees explained that "gunning" can make DOC facilities extremely difficult places to work, and, for years after, can leave a scar. For instance, Captain Julie Kunkel testified that—as a corrections officer at Northern in the 1990—"it was pretty gross being a

female" officer and that she "can still hear the sounds of the inmates masturbating when you walked on the tier." Trial Tr., Doc. No. 155, at 469:2–6. Kunkel recounted that "it happened a lot" and that she "remember[s] to this day the smell and the sound." *Id.* at 469:17–18. Former Warden Anne Cournoyer testified that, when she toured a unit as a correctional counselor at Somers Prison (now Osborn Correctional Institution), prisoners

> oftentimes . . . would strip down to be naked and just stand there and wait for me to come. They would, you know, have an erection. They would masturbate in front of me. They would ejaculate in front of me.

Trial Tr., Doc. No. 156, at 510:24–511:2. Cournoyer explained that that created "a very threatening environment." *Id.* at 511:16. One inmate who testified in this trial—Andres Sosa—has received Class A tickets for public indecency for masturbating while being treated by a female nurse and in a classroom while a female teacher was teaching. *See* Disciplinary Reports, Defs.' Ex. V, at Bates 000012 (nurse), 000052 (class); Trial Tr., Doc. No. 154, at 137:12–139:22.

Both before and after 2012, "gunning" has qualified as "public indecency" and so has been a Class A offense. *See* Trial Tr., Doc. No. 154, at 34:15. Class A offenses are the highest class of offense in the DOC and can result in punitive segregation,[3] forfeiture of good time or risk reduction earned credits, and up to two different penalties from a list including, for instance, loss of recreation, telephone, or commissary privileges for at least 30 days. *See* Administrative Directive 9.5, Defs.' Ex. U, at ¶¶ 10, 12. Normally, the punishment for a first-time Class A offense seems to have been seven days in punitive segregation and loss of recreation and commissary privileges for 30 days. *See Ortiz* Trial Tr., Doc. 80, at 234:21–23 (Hartnett). Even though "gunning" has always been a Class A "public indecency" offense, DOC employees did

---

[3] Punitive segregation involved a physical separation from the general inmate population and began with a strip search. *See Ortiz* Trial Tr., Doc. No. 79, at 20:19–25 (Ortiz).

not submit a disciplinary report for every instance of "gunning" to which they were exposed. Captain Jose Rivera explained that "sometimes female staff members don't report ['gunning' incidents] all the time" because they "feel that, especially an inmate who does it often . . . just doesn't care about the disciplinary report that they're going to get from it." Trial Tr., Doc. No. 156, at 540:18–24; *see also* Trial Tr., Doc. No. 154, at 114:3–7 (Sosa explaining that he does not get a disciplinary report every time he masturbates in front of a female DOC employee); *id.* at 140:19–20 (Sosa describing his theory that "they write you off to secure their job" but "[a]fter that, they won't write you again").

The work environment inside DOC facilities was difficult in the years leading up to 2012 not only because of the pervasiveness of sexually explicit pictorial depictions and "gunning." Indeed, in April 2003, a settlement was reached in two class action suits brought by female DOC employees against the State of Connecticut; the suits alleged, generally, that male DOC employees had been sexually harassing female DOC employees. *See* Stipulated Agreement, Defs.' Ex. J; *Ortiz* Trial Tr., Doc. No. 80, at 250:4–21 (Rinaldi); Trial Tr., Doc. No. 156, at 522:23–523:21 (Cournoyer); Trial Tr., Doc. No. 154, at 186:9–14 (Redden). The stipulated agreement that resolved those suits called for the establishment of an advisory committee on women's issues and a working group on sexual harassment, which were meant to address, in part, the DOC facilities' hostile work environment. *See* Stipulated Agreement, Defs.' Ex. J, at ¶¶ 64, 76. The stipulated agreement also called for the codification of Administrative Directive 2.2, which was a new sexual harassment policy. *See id.* at ¶¶ 21–22; A.D. 2.2, Defs.' Ex. S. Given all the foregoing, it would be incorrect to say that the sexually hostile environment in DOC facilities before 2012 owed entirely to inmates' belongings and behavior.

Before the 2012 ban, testimony established that the presence of sexually explicit publications in DOC facilities made cell shakedowns potentially less efficacious. Although there are a variety of types of shakedown,[4] shakedowns are, essentially, thorough cell searches. As Captain Hartnett explained, in a regular cell shakedown, a DOC corrections officer

> would go through basically all the inmate's property. Start with the bunk, you'd look under the mattress, you'd take the sheets off, make sure the mattress was intact, that it wasn't opened and so that something could be hidden inside the mattress. You go through the foot locker, you go through his desk. Any of his mail you usually go through as well. Basically you're trying to go from the ceiling to the floor to make sure that there was nothing in the cell that the inmate shouldn't have.

*Ortiz* Trial Tr., Doc. No. 80, at 158:11–24. Cell shakedowns are a primary way that DOC corrections officers ensure safety in DOC facilities by finding and seizing contraband. *See* Trial Tr., Doc. No. 155, at 309:6–10 (Smalls). Contraband can include dangerous items such as drugs or weapons, but it can also take the form of, for instance, "excess food, worn cords, electronics, clothing, toiletries, or similar items that can be used to barter or that can create unsanitary or hazardous conditions within the prison." Semple Aff., Defs.' Ex. L, at ¶¶ 13–14. Shakedowns only infrequently required strip searches; when a strip search was necessary, a male corrections officer would conduct the strip search, during which an inmate was forced to reveal his genitals; sometimes, inmates reported, a female officer was present and could see the inmate during the strip search. *See, e.g.*, *Ortiz* Trial Tr., Doc. No. 79, at 28:20–29:19 (Ortiz); Trial Tr., Doc. No. 155, at 308:13–309:2 (Smalls); *but see* Trial Tr., Doc. No. 156, at 539:1–21 (Rivera explaining that the Prison Rape Elimination Act requires—and the DOC adheres to the requirement—that females be relieved of their duties when a male inmate is strip searched).

---

[4] *See Ortiz* Trial Tr., Doc. No. 79, at 21:1–28:5 (Ortiz); *Ortiz* Trial Tr., Doc. No. 80, at 157:12–159:4 (Hartnett).

DOC corrections officers normally conducted shakedowns in pairs. *See, e.g.*, *Ortiz* Trial Tr., Doc. No. 80, at 179:16 (Hartnett); *Ortiz* Trial Tr., Doc. No. 79, at 19:12–21 (Ortiz). Both male and female DOC corrections officers participated in shakedowns. *See* Trial Tr., Doc. No. 156, at 538:22–539:4 (Rivera explaining that, with one limited exception for strip-searching, male and female COs do the exact same job). Some inmates and DOC employees testified that female corrections officers were especially uncomfortable looking through sexually explicit materials and would allow the male corrections officers to conduct that portion of the shakedown. *See Ortiz* Trial Tr., Doc. No. 79, at 19:22–25, 79:10–12 (Ortiz); *Ortiz* Trial Tr., Doc. No. 80, at 180:3–182:8 (Hartnett). Several DOC employees explained that inmates often hid contraband inside sexually explicit materials because they believed corrections officers would search those materials less thoroughly "because of their embarrassment, disgust, humiliation, or because it was not sanitary to do so." Semple Aff., Defs.' Ex. L, at ¶¶ 18–20; *see also* Dzurenda Aff., Defs.' Ex. P, at ¶ 7; *Ortiz* Trial Tr., Doc. No. 80, at 180:13–181:23 (Hartnett). Some inmates disputed that they would hide contraband inside pornographic magazines because they *wanted* corrections officers to spend time looking through the magazines rather than shaking down their cells. *See* Trial Tr., Doc. No. 155, at 309:21–310:14 (Smalls).

Both before and after 2012, bartering has been prevalent in DOC facilities. Bartering is defined as "[c]onducting any transaction for which payment of any kind is made, promised or expected." A.D. 9.5, Defs.' Ex. U, at ¶ 13. Inmates can and do barter anything of value; items with the highest value are normally those with the lowest supply (and therefore highest demand), which is normally contraband, but can be anything. *See* Trial Tr., Doc. No. 156, at 542:22–543:19 (Rivera). Bartering is not allowed because it puts the lender in a position of power, and disagreements over the terms of the loan or deal can cause fights. *See id.* at 543:2–8. However,

bartering was common before 2012, including with sexually explicit materials. *See, e.g.*, *Ortiz*, Trial Tr., Doc. No. 79, at 81:4–8 (Ortiz describing exchanging pornographic magazine subscriptions); Trial Tr., Doc. No. 80, at 161:22–165:4 (Hartnett explaining the commonality of bartering sexually explicit materials). Both before and after 2012, bartering has been defined as a Class B offense, which is punishable by, potentially, punitive segregation, forfeiture of good time or risk reduction earned credits, and one penalty from a list including, for instance, loss of recreation, telephone, or commissary privileges for at least 30 days. *See* A.D. 9.5, Defs.' Ex. U, at ¶¶ 10, 13.

      B.  <u>2012 Ban</u>

In about August 2010,[5] Leo Arnone (then-DOC Commissioner) tasked Brian Garnett (the then-Director of External Affairs) with reviewing the DOC's policy regarding the possession of sexually explicit material by the inmate population. *See* Garnett Aff., Defs.' Ex. O, at ¶ 4. Commissioner Arnone noted in his charge to Director Garnett that the DOC's current policy regarding the possession of sexually explicit materials in A.D. 10.7 left "great leeway for the possession of seriously offensive and pornographic depictions of sexual activity and that such depictions are . . . displayed in areas of correctional facilities where staff is exposed to them." *Id.* at ¶ 6. Commissioner Arnone initially wanted Garnett to determine whether a two-tiered system was feasible for sexually explicit materials; in that system, "inmates would be allowed to possess pictorial depictions of nudity (i.e., similar to those found in publications such as *Playboy* magazine), but would not be permitted to possess the depictions of explicit sexual activity that

---

[5] Although two other affidavits indicate that Arnone convened the committee in August 2009 rather than 2010, I believe that the timeline makes sense only if the committee was convened in August 2010, as Garnett's affidavit asserts. *See* O'Brasky Aff., Defs.' Ex. M, at ¶ 4; Redden Aff., Defs.' Ex. N, at ¶ 18.

commonly are found in the facilities today." *Id.* at ¶ 7.  Garnett subsequently formed a six-member committee to address Commissioner Arnone's request.[6]

The committee undertook its work with either three or four goals in mind: (1) to enhance the safety, security and order of DOC facilities, (2) to support the rehabilitation of the inmate population, (3) to enhance a professional and non-hostile work environment, and (4) to prevent inappropriate behavior.  *See id.* at ¶ 9.  While the first three goals are consistently cited throughout the evidence in this case, the Defendants cite the fourth goal—to "prevent inappropriate behavior"—sporadically.  *Compare* Garnett Aff., Defs.' Ex. O, at ¶ 9 (appearing) *with* Garnett Mem., Defs.' Ex. C, at 21 (excluded) and Defs.' Post-Trial Brief, Doc. No. 147, at 3 (excluded) and Notices, Defs.' Exs. D, G (excluded).

The committee met about once per month, for one to two hours each time, for a period of about six months.  *See* Garnett Aff., Defs.' Ex. O, at ¶ 10; Trial Tr., Doc. No. 154, at 150:1–9. (Redden).  The committee "reviewed the existing policy, researched policies adopted by other states and the Federal Bureau of Prisons, and reviewed the historical and current case law from other state and federal courts."  Garnett Aff., Defs.' Ex. O, at ¶ 10.  In October 2010, staff attorney O'Brasky and Captain Chartier sent the committee a memorandum summarizing the current state of the law with respect to department of corrections' bans on sexually explicit materials; that memorandum listed and described cases which, in their view, both upheld[7] and

---

[6]  The members of the committee were: Garnett, Deputy Commissioner James Dzurenda, Director of Security Kimberly Weir, Captain Roger Chartier, Staff Attorney Nancy Kase O'Brasky, and Sex Offender Treatment Coordinator Eileen Redden.  *See* Garnett Aff., Defs.' Ex. O, at ¶ 8.

[7]  Those cases were: (1) *Thornburgh v. Abbott*, 490 U.S. 401 (1989); (2) *Strope v. Collins*, 315 F. App'x 57 (10th Cir. 2009); (3) *Mauro v. Arpaio*, 188 F.3d 1054 (9th Cir. 1999) (en banc); (4) *Waterman v. Farmer*, 183 F.3d 208 (3d Cir. 1999); (5) *Amatel v. Reno*, 156 F.3d 192 (D.C. Cir. 1998); (6) *Giano v. Senkowski*, 54 F.3d 1050 (2d Cir. 1995).

struck down[8] similar bans.  *See* O'Brasky and Chartier Mem., Pl.'s Ex. 35.   Over the course of

its existence, the committee consulted neither with inmates nor with the working group on sexual

harassment nor with the advisory committee on women's issues.  *See* Trial Tr., Doc. No. 154, at

219:5–220:5 (Redden).

The committee examined the feasibility of two different kinds of partial bans on sexually

explicit materials.  The first, as described above, contemplated a ban on "hardcore" sexual

activity but allowing in pictorial depictions of nudity, such as those in *Playboy*.  The committee

noted that Florida, for instance, allowed certain depictions of nudity into its state prison facilities.

*See* Garner Mem., Defs.' Ex. C, at 22 & App'x 9.[9]   However, the committee decided that that

type of partial ban would not work because its implementation "would require an ongoing,

subjective monitoring system to determine what materials would be allowable," the system

"would be difficult—if not impossible—to codify and would, therefore, result in an inconsistent

implementation of the policy," and "such a system would be financially costly and labor

intensive."  Garnett Aff., Defs.' Ex. O, at ¶ 16.  The committee explained that its review of such

two-tiered policies in other states revealed that such bans were codified in "convoluted and

tortured language" that tries "to strictly define what would be allowed."  Garnett Mem., Defs.'

Ex. C, at 22.

The second type of partial ban that the committee considered was a two-tiered approach

that would impose different standards for inmates who were, and were not, sex offenders.  *See*

Garner Aff., Defs.' Ex. O, at ¶ 17.  The idea behind such an approach is that sexually explicit

---

[8]  Those cases were: (1) *Ramirez v. Pugh*, 379 F.3d 122 (3d Cir. 2004); (2) *Couch v. Jabe*, 737 F. Supp. 2d 561
(W.D. Va. 2010); (3) *Cline v. Fox*, 319 F. Supp. 2d 685 (N.D.W. Va. 2004); (4) *Aiello v. Litscher*, 104 F. Supp. 2d
1068 (W.D. Wis. 2000).
[9]  Florida's regulation does not ban nudity, per se, but it does ban: (1) depictions of "sexual conduct," which is
included to define "[a]ctual lewd exhibition of the genitals," and (2) depictions of "nudity in such a way as to create
the appearance that sexual conduct is imminent," which includes "display of sexual organs in an aroused state."  *See*
Fla. Admin. Code r. 33-501.401, Defs.' Ex. C, App'x 9, at ¶¶ 3(i), (j).

materials of any kind are more damaging to the rehabilitation of a sex offender than a non-sex offender. In the DOC, about 20 percent of inmates (some 3,000 in total) are "sex offenders," which means they have an elevated sex treatment score. *See* Redden Aff., Defs.' Ex. N, at ¶ 6; Dzurenda Aff., Defs.' Ex. P, at ¶ 10. An inmate can get an elevated sex treatment score by being convicted of a sexual crime, or, even if not, if his case has underlying sexual elements. *See Ortiz* Trial Tr., Doc. No. 79, at 96:22–97:9 (Redden). Although not entirely clear, it appears than an inmate's sex treatment score can be elevated through his misbehavior as an inmate. *See, e.g.*, Trial Tr., Doc. No. 156, at 533:11–16 (Cournoyer). The committee rejected a two-tiered approach based on the distinction between sex offender inmates and non-sex offender inmates because: (1) sex offenders are interspersed within the general inmate population, and so enforcing such a different standard would be "impractical, if not impossible"; (2) materials within DOC facilities flow freely, and so even if the policy prohibited sex offenders from possessing nude pictorial depictions, if nude pictorial depictions were present in the DOC facilities, they would be able to obtain them through bartering. *See* Redden Aff., Defs.' Ex. N, at ¶ 20; Garnett Aff., Defs.' Ex. O, at ¶ 17.

The committee thus decided that a *total ban* on pictorial depictions of sexual activity and nudity was the only way to accomplish its goals. *See* Garnett Aff., Defs.' Ex. O, at ¶ 18. The committee explained that it considered the ban's effect on inmates and felt that the ban adequately balanced the committee's goals with inmates' interests. In particular, the committee noted (1) that the ban would be limited by an exception for sexually explicit pictorial depictions that are of a literary, artistic, educational, or scientific nature, and (2) that the ban related only to pictorial depictions of sexual activity and nudity, and so inmates had alternative means to obtain sexually explicit material, such as written material. *See id.* at ¶¶ 19–22. Along the same lines,

the committee suggested that the ban be implemented only after a lengthy "phase-in" process to "minimize the potential to incite the inmate population." *Id.* at ¶ 23. Ultimately, a one-year "phase-in" process was agreed; that period allowed inmates to "dispose of, or send home, any [to-be banned] materials in your possession" and allowed "any magazine subscriptions to expire." *See, e.g.*, Notice, Defs.' Ex. D. Between July 8, 2011 and June 1, 2012, the DOC issued four notices to the inmate population that explained the impending change. *See* Notices, Defs.' Exs. D (July 8, 2011), G (April 2, 2012), H (May 10, 2012), I (June 1, 2012). The new policy, as codified in A.D. 10.7, became effective on June 19, 2012. *See* A.D. 10.7, Defs.' Ex. A, at 1.[10]

The new policy was codified in a portion of A.D. 10.7. That portion read:

N. <u>Incoming Publications and Educational Materials</u>. . . . Incoming materials which adversely affect a valid penological interest may be rejected in accordance with the following review procedures:

    1. <u>Procedures for Review of Publications</u>. The Unit Administrator or designee may reject a publication only if it is determined to be detrimental to the security, good order, or discipline of the facility or which may facilitate criminal activity. The Unit Administrator or designee may not reject a publication solely because its content is religious, philosophical, political, social or sexual, or because its content is unpopular or repugnant. Publications which may be rejected by a Unit Administrator or designee include but are not limited to publications which meet one of the following criteria:

    . . .

        g. it is sexually explicit material, either pictorial or written, which by its nature or content poses a threat to the security, good order, or discipline of the facility, facilitates criminal activity or harasses staff.

            1) Pictorial sexually explicit material that shall be rejected by a Unit Administrator or designee is any visual depiction of sexual activity or nudity, . . . unless those materials which,

---

[10] Although A.D. 10.7 itself indicates it went into effect on June 19, 2012, the notices posted in the year leading up to the implementation said the ban would become effective on June 30, 2012. *See* Notices, Defs.' Exs. D, G, H, I.

taken as a whole, are literary, artistic, educational or scientific in nature.

Pictorial depiction of sexual activity is defined as the visual depiction of conduct which includes but is not limited to:

- sexual intercourse, including genital-genital, oral-genital, or oral-anal contact, whether between persons of the same sex or opposite sex, with any artificial device, or any digital penetration;
- bestiality;
- masturbation;
- sadistic or masochistic abuse;
- depiction of bodily functions, including urination, defecation, ejaculation, or expectoration;
- conduct involving a minor, or someone who appears to be under the age of 18; and
- sexual activity which appears to be non consensual, forceful, threatening or violent.

Pictorial depiction of nudity is defined as the visual depiction or display of genitalia, pubic region, buttock, or female breast at a point below the top of the areola that is not completely and opaquely covered.

2) Written sexually explicit material that may be rejected by a Unit Administrator or designee include but is not limited to written material which, by its nature or content, poses a threat to the security, good order, or discipline of the facility, or facilitates criminal activity. A Unit Administrator or designee shall determine that written sexually explicit material of the following types is to be excluded:

1) sado-masochistic;
2) bestiality;
3) involving minors; or
4) materials depicting sexual activity which involves the use of force or without the consent of one or more parties.

. . .

3) Possession or transferring of pictorial sexually explicit materials will result in the issuance of a Class 'A' Discipline in accordance with Administrative Directive 9.5 Code of Penal Discipline.

A.D. 10.7, Defs.' Ex. A, at ¶ 4(N)(1)(g).

### C. Implementation of 2012 Ban

The DOC implemented a process for enforcing the 2012 ban. Facility-level mailroom staff undertake the first level of review of incoming publications. *See Ortiz* Trial Tr., Doc. No. 80, at 166:20 (Hartnett). If the mailroom staff looks at a publication and determines that it does not run afoul of A.D. 10.7, then the staff member admits the publication into the DOC facility. *See id.* at 166:20–22 (Hartnett). That is precisely what happens to the majority of incoming publications. *See* Trial Tr., Doc. No. 155, at 431:15–19 (Hartnett). But if the mailroom staff member believes the incoming publication might run afoul of A.D. 10.7, the staff member sets it aside for the media review point person at that facility—each facility has one, and that person serves as a member on the Media Review Board ("MRB") (*see* below). *See Ortiz* Trial Tr., Doc. No. 80, at 166:22–25 (Hartnett). The facility-level media review officer can decide (1) to admit the publication in question because it clearly complies with A.D. 10.7, (2) to reject the publication in question because it clearly violates A.D. 10.7,[11] or (3) to withhold the publication and present it to the entire MRB for a determination. *See id.* at 167:1–4 (Hartnett); A.D. 10.7, Defs.' Ex. A, at ¶ 4(N)(2); Defs.' Post-Trial Brief, Doc. No. 147, at 11.

---

[11] It is not perfectly clear from the evidence that rejecting a publication out-of-hand is within the province of each facility's media review representative. Most of the evidence suggests that it is. *See, e.g.*, Trial Tr., Doc. No. 155, at 475:12–23 (Kunkel describing how a facility-level "officer" doing a first review can reject a book based on a pictorial depiction of a "boob"); A.D. 10.7, Defs.' Ex. A, at ¶ 4(N)(2) (establishing facility-level individual review of publications); Defs.' Post-Trial Brief, Doc. No. 147, at 11 (noting that only if "the publication is still deemed questionable, it is forwarded to the MRB"). On the other hand, the facility-level reviewer's authority to reject a publication was never stated clearly, and some testimony seemed to suggest that all "questionable" material was forwarded to the MRB. *See, e.g.*, Trial Tr., Doc. No. 155, at 413:7–414:1 (Hartnett confirming that if the media review representative at a facility "ha[s] an issue," or is "concerned that something could not come in," the material gets forwarded to the MRB). I further understand that if a publication is rejected by a facility-level media review representative, the inmate who was supposed to receive the publication gets a notice of the rejection and may appeal that decision. *See* A.D. 10.7, Defs.' Ex. A, at ¶ 4(N)(3).

The MRB is the DOC body that is ultimately responsible for withholding incoming publications that violate the terms of A.D. 10.7. The MRB is a group of about 19 DOC employees, including one member from each of fifteen facilities and representatives from the legal affairs unit, the religious services unit, the educational unit, and the security division. *See Ortiz* Trial Tr., Doc. No. 80, at 166:5–15 (Hartnett). From 2012 until 2017, Captain Hartnett was the chairperson of the MRB; and from 2017 through the time of this trial in 2019, Captain Kunkel was the chairperson. Captain Hartnett explained that the members of the MRB—which included corrections officers, custody supervisors, counselors, treatment officers, support staff, a librarian, and an attorney—represented a "good cross section of people with a lot of experience" in DOC facilities. *See Ortiz* Trial Tr., Doc. No. 80, at 169:1–10; Defs.' Post-Trial Brief, Doc. No. 147, at 10–11.

The MRB met twice per month for about three hours each time. *Ortiz* Trial Tr., Doc. No. 80, at 202:10–12 (Hartnett). At any given meeting, Captain Hartnett estimated that between twelve and fifteen members were in attendance. *See id.* at 186:8 (Hartnett). At each meeting, the MRB reviewed anywhere from 50 to 100 publications. *See id.* at 202:15 (Hartnett). The MRB reviewed publications for sexually explicit pictorial depictions, but it also reviewed publications for all of types of impermissible written or pictorial depictions, such as those that might help an inmate construct a weapon or pick a lock, those that might be written in code, those that encourage or instruct in the commission of criminal activity, or those that might, in writing, describe sado-masochism or rape, for instance. *See* A.D. 10.7, Defs.' Ex. A, at ¶ 4(N)(1)(g). When the MRB reviews a publication, its internal guidelines (not codified) call for different standards with respect to books and magazines. When reviewing a magazine, if the magazine has five or fewer pages of objectionable materials (of any kind), the MRB simply rips

out those pages and admits the altered magazine into the DOC facility. However, if a magazine has six or more pages of objectional materials, the entire magazine is rejected. *See Ortiz* Trial Tr., Doc. No. 80, at 214:7–22 (Hartnett). The same exception does *not* apply to books—that is, if even one page of a book violates A.D. 10.7, the entire book is rejected. *See id.* The reason for that difference is the high cost of books relative to magazines; if a book is rejected, the inmate might want to return that book for its full price rather than receiving an altered book. *See* Trial Tr., Doc. No. 155, at 476:2–13 (Kunkel).

The 2012 ban has several qualifying clauses. Three in particular are important. The first is the direction that a DOC employee "may reject a publication only if it is determined to be detrimental to the security, good order, or discipline of the facility or which may facilitate criminal activity." *See* A.D. 10.7, Defs.' Ex. A, at ¶ 4(N)(1). Captain Hartnett explained that that phrase hardly ever, if at all, entered the MRB's thinking when it was considering the admissibility of a publication. *See* Trial Tr., Doc. No. 155, at 466:16–20. The second is the limitation that a DOC employee "may not reject a publication solely because its content is religious, philosophical, political, social or sexual, or because its content is unpopular or repugnant." A.D. 10.7, Defs.' Ex. A, at ¶ 4(N)(1). That limitation, too, seems to have been only a vague direction to consider inmates' rights under the First Amendment; there was no evidence in this case that that limitation played any significant part in MRB considerations, either. However, the third limitation was the topic of much discussion: DOC employees were not to reject pictorial sexually explicit material that was, taken as a whole, "literary, artistic, educational or scientific in nature." *Id.* at ¶ 4(N)(1)(g)(1). I will refer to that limitation as the "Artistic Exception."

At each meeting, the MRB went through the materials gathered during the preceding two-week period. The MRB first discussed whether the publication at issue violated the terms of A.D. 10.7. Indeed, the text of A.D. 10.7 was brought to every meeting so that the MRB could refer to its exact text. *See* Trial Tr., Doc. No. 155, at 476:23–477:12 (Kunkel). If the publication at issue did violate the terms of A.D. 10.7, the MRB next discussed whether the Artistic Exception applied. If, at any step, there was a close question on which members disagreed, that disagreement was put to a simple majority vote. *See Ortiz* Trial Tr., Doc. No. 80, at 167:10–20 (Hartnett).

The members of the MRB who testified admitted that applying the Artistic Exception was extremely difficult. As Captain Hartnett testified on direct examination:

> Q:    When you're sitting on the media review board, are you ever in a position where you need to make a determination of what constitutes porn versus what constitutes art?
>
> A:    Yes.
>
> Q:    And what tools do you use to make that determination?
>
> A:    Generally it's just the experience of the people in the room. You know, we use our experience in corrections and what we've been exposed to and what we've seen.

Trial Tr., Doc. No. 155, at 437:19–438:2. Indeed, on cross-examination, Captain Hartnett admitted that under certain hypothetical circumstances, the MRB might reject a picture of Michelangelo's statue of David as not qualifying for the Artistic Exception. *See id.* at 451:19–452:9.

As Dwight Pink's testimony made clear, inmates who order art books with depictions of nude models present a difficult borderline case. Pink attempted to order *Atlas of Foreshortening: The Human Figure in Deep Perspective* by John Cody with Ron Tribell. That

book consists almost entirely of full-page nude photos of one man and one woman in various poses. *See* Pl.'s Ex. 11. The MRB rejected *Atlas of Foreshortening* as sexually explicit material not subject to the Artistic Exception. *See* Letter, Pl.'s Ex. 12. Captain Hartnett explained that the MRB admits art books that "g[i]ve instruction or information pertaining to the actual form of the art" but rejected *Atlas of Foreshortening* because it did not do that—in other words, the MRB determined that the *purpose* of *Atlas of Foreshortening* was not instruction. *See* Trial Tr., Doc. No. 155, at 432:9–433:15. Captain Hartnett identified another problem with *Atlas of Foreshortening*: an inmate could rip out the full-length pages of pictorial depictions of nudity, "and he's got a number of pictures which are now contraband." *See id.* at 434:14–435:5. Indeed, Captain Kunkel testified that if there were an exception for all art books, "[e]verybody would be ordering art books that contained nude pictures and photography books that are just nude . . . to get around" the 2012 ban. *See* Trial Tr., Doc. No. 155, at 478:7–13.

Despite the difficulties in applying the Artistic Exception, members of the MRB who testified all expressed confidence in the integrity of their decisionmaking process and enough humility to acknowledge that sometimes they surely got it wrong. *See, e.g.*, Trial Tr., Doc. No. 155, at 443:2–4 (Hartnett explaining that "we all took it seriously" and "did the best we could"); *id.* at 443:8–9 (Hartnett remarking that "[w]hat's art to me could be porn to my mother"); *id.* at 473:2–17 (Kunkel remarking that the MRB had made a mistake in rejecting *Island of Vice*—*see* Pl.'s Exs. 3 (excerpt), 3A (full book), and 4 (MRB rejection letter)—a book that was almost entirely text and regarded Teddy Roosevelt and New York City); Spreadsheet, Pl.'s Ex. 27 (a 413-page spreadsheet cataloging every publication the MRB reviewed from 2014 to 2018 and the outcome of its review).

Indeed, less than two years after the 2012 ban went into effect, the MRB realized that the definition of "nudity" in the 2012 ban was overbroad and the MRB—in faithfully applying the language of the 2012 ban—was excluding publications that were not meant to be captured by the spirit of the 2012 ban. In the 2012 ban, "nudity" was defined as "the visual depiction or display of genitalia, pubic region, buttock, or female breast at a point below the top of the areola that is not completely and opaquely covered." *See* A.D. 10.7, Defs.' Ex. A, at ¶ 4(N)(1)(g). There were two problems with that definition. First, buttocks and cleavage are ubiquitous in mainstream publications: for instance, *US Weekly* was at one point excluded by this definition, and pictures of actresses in cocktail dresses qualified as nudity. *See Ortiz* Trial Tr., Doc. No. 80, at 176:5–17 (Hartnett describing the red carpet cleavage problem); *id.* at 178:2–12 (Hartnett describing the *US Weekly* instance); *id.* at 196:2–10 (Hartnett explaining that buttocks are ubiquitous in modern media materials). As a result, in January 2014, the definition of "nudity" in A.D. 10.7 was changed to be "the visual depiction or display of genitalia, pubic region, anus or female breast where the areola is visible and not completely and opaquely covered." *See* Revision to A.D. 10.7, Defs.' Ex. B.

Relatedly, every MRB decision is appealable. (In fact, inmates can also preemptively write to the director of security to find out if a publication that they are thinking of ordering will be admitted. *See, e.g.*, Letter, Pl.'s Ex. 4 (such a letter from the Director of Internal Security to Reynolds).) When a publication is rejected, an inmate receives a notice indicating the reason for rejection. *See* Trial Tr., Doc. No. 155, at 429:7–12 (Hartnett); A.D. 10.7, Defs.' Ex. A, at ¶ 4(N)(1)(g)(3). Should an inmate wish to appeal the rejection, he can appeal to the commissioner's designee, who "happens to be the director of security." *See* Trial Tr., Doc. No. 155, at 429:13–15 (Hartnett). The commissioner's designee conducts an "independent review"

and makes a final decision. *See Ortiz* Trial Tr., Doc. No. 80, at 183:10–15 (Hartnett).

Apparently, at least in the time from 2017 through the time of this trial, inmate appeals would go

first to the MRB's chairperson before making their way to the commissioner's designee. Captain

Kunkel testified that as chairperson of the MRB, any appeal regarding publications that the MRB

had rejected "originally comes to me, and I will do the preliminary in-depth review." *See* Trial

Tr., Doc. No. 155, at 474:15–22. That in-depth review could include, for instance (assuming that

the rejected publication was a book), doing research on the book, reading "a lot" of the book,

reading the publisher's review of the book, reading reviewers' comments on the book, and

preparing a review for the director of security. *See id.* at 474:1–25. The director of security will

then make a final decision and send a brief notice to the inmate detailing the reason for rejection,

or the reason for reversal. *See, e.g.*, Letter, Pl.'s Ex. 10 (upholding rejection); Letter, Pl.'s Ex. 12

(upholding rejection); Letter, Pl.'s 14 (upholding rejection); Letter, Pl.'s Ex. 16 (upholding

rejection); Letters, Defs.' Ex. CC (upholding rejections); Letter, Pl.'s Ex. 19 (reversing

rejection); Letters, Defs.' Ex. DD (upholding numerous rejections and reversing one); Letter,

Defs.' Ex. EE (reversing rejection). DOC statistics indicate that from 2012 through 2017, about

68 percent of rejections for sexually explicit material were upheld in their entirety. *See*

Response, Pl.'s Ex. 54, at ¶ 7.

    D.  <u>Apparent Effects of 2012 Ban</u>

       1.  Inmates

Each of the six inmates who testified explained that the 2012 ban had had a negative

effect on him. For instance, although Reynolds testified that he masturbates the same amount

now as he did before the ban, he has less to stimulate him. *See* Trial Tr., Doc. No. 154, at 63:2–

9. That loss of stimulation, Reynolds said, has led to increased stress and has made Reynolds resort to objectifying female DOC employees. Reynolds explained that without nude magazines:

> I don't have one outlet, one healthy outlet, which would have been the magazines, so now every time I hear a female voice, I notice I go to the door. My C.O., she walks by, I'm looking at her butt as she walks off . . . . [B]efore, I never paid attention to them one way or the other. I had magazines. The magazines had women nude.

*Id.* at 27:13–25. Reynolds has never "gunned down" a female DOC employee, but he now looks at them in a more sexual way. *See id.* at 70:7–15. Reynolds admitted that there are other possible ways that he could become stimulated—such as by seeing an attractive actress on TV, a personal memory, or a memory of his old magazines. *See id.* at 70:16–71:22.

Several inmates testified that since the 2012 ban, they masturbate less. *See, e.g.*, Trial Tr., Doc. No. 154, at 131:9–12 (Sosa); Trial Tr., Doc. No. 155, at 294:20–295:8 (Vivo); *id.* at 314:19–25 (Smalls explaining that masturbating post-ban is "extremely hard"). Inmates echoed Reynolds's testimony that they have begun to view female DOC employees in a more sexual manner since the 2012 ban. *See, e.g.*, Trial Tr., Doc. No. 154, at 111:14 (Sosa). Inmates also reported that, after the ban was put in place, they feel more depressed and stressed. *See, e.g.*, Trial Tr., Doc. No. 154, at 27:1–7 (Reynolds); Trial Tr., Doc. No. 155, at 315:4–5 (Smalls). One inmate, Sosa, reported that he has become "more horny" since the ban. *See* Trial Tr., Doc. No. 154, at 120:7–9; Disciplinary Reports, Defs.' Ex. V (showing that Sosa has accumulated more disciplinary reports for "gunning" *after* 2012 than before).

Pink testified that his displeasure with the 2012 ban was not that it made masturbating more difficult but that it hindered his ability to make art and to improve as an artist. Since he has been incarcerated, Pink's hobby has become drawing. *See* Drawings, Pl.'s Ex. 53. Since 2012, when the nudity ban came into effect, Pink has had several art books depicting nude models

either confiscated or rejected. *See* Books, Defs.' Exs. W (*Art Models Series* (multiple volumes)), X (*Virtual Pose 4*), Y (*The Nude Figure*), and Z (*The Nude Female Figure*); Trial Tr., Doc. No. 154, 83:14–92:19 (Pink describing many of those).

Some inmates testified that the ban has led to a negative culture change inside DOC facilities. For instance, Vivo testified that since 2012, inmates in DOC facilities are exhibiting "more like a predator atmosphere" and "[w]hen they see a picture or they see females, they like stalkers, and disrespectful." *See* Trial Tr., Doc. No. 155, at 284:16–23. Vivo and Smalls explained that the climate was worse now for female corrections officers than it was before. *See id.* at 288:13 (Vivo); *id.* at 320:22–321:3 (Smalls describing the atmosphere as "more aggressive"). Smalls indicated that, in his estimation, there had been no change in the amount of "gunning," cat calling, or inmate-on-inmate violence since 2012. *See id.* at 317:10–320:2; *see also* Trial Tr., Doc. No. 154, at 34:19 (Reynolds estimating that sexual harassment of female corrections officers has gotten worse since 2012).

Finally, inmates reported that the nudity ban has made bartering worse because the price for sexually explicit pictorial depictions has gone up as their supply has gone down. *See, e.g.*, Trial Tr., Doc. No. 155, at 278:2–15 (Vivo); *id.* at 305:6–16 (Smalls).

### 2. Staff

From DOC employees' perspective, since the 2012 nudity ban, "morale . . . has improved." *Ortiz* Trial Tr., Doc. No. 80, at 252:4–5 (Rinaldi). Former deputy warden Cournoyer testified that there was a "very positive" climate at Enfield between 2016 and 2018 due to more mutual respect between the inmates and the staff. *See* Trial Tr., Doc. No. 156, 522:4–11. Sexually explicit pictorial depictions are clearly much less pervasive in DOC facilities now.

The Defendants also believe that, contrary to the Plaintiffs' contentions, "gunning" has decreased dramatically since 2012. Indeed, the number of disciplinary reports handed out for public indecency (which includes "gunning") has decreased from the levels immediately preceding the ban:

| Year | Public Indecency Tickets |
|------|--------------------------|
| 2007 | 164 |
| 2008 | 161 |
| 2009 | 338 |
| 2010 | 424 |
| 2011 | 461 |
| 2012 | 494 |
| 2013 | 194 |
| 2014 | 171 |
| 2015 | 161 |
| 2016 | 148 |
| 2017 | 153 |
| 2018 | 79 |

*See* DOC Research, Defs.' Ex. BB. (Plaintiffs contest the reason for that decline and its significance; that debate is taken up below.)

Even DOC employees, though, appear to admit that bartering—or the possibility of bartering—sexually explicit pictorial depictions has gotten worse since the 2012 ban. DOC employees confirmed that the price of sexually explicit pictorial depictions has gone up since the nudity ban. *See* Trial Tr., Doc. No. 156, at 544:9–11 (Rivera testifying that sexually explicit magazines were going for $60 to $100 worth of commissary at the time of trial).

E. Psychological Effect of Sexually Explicit Materials

At trial, each side produced a witness who testified about the effects of sexually explicit material on inmates' aggression. The Defendants produced Eileen Redden, who, as already explained, was at the time of the *Ortiz* trial the DOC's Durational Program Manager and whose job duties included overseeing the DOC's sex offender treatment program. *See* Redden Aff.,

Defs.' Ex. N, at ¶ 2–4. Redden explained that through her work—she estimated that she had worked with sex offenders for over 30,000 hours—she "learned of the potentially dangerous effects caused by the viewing of and exposure to pornography by inmates in correctional facilities." *See id.* at ¶¶ 5, 7. As part of her job, Redden helped run therapy treatment groups. Those groups met once per week for two hours over, ideally, a year. The groups included between fifteen and eighteen inmates who had "prior problem sexual behavior" and two therapists (one of each gender) as group leaders. *See Ortiz* Trial Tr., Doc. No. 79, at 97:10–99:24 (Redden).

From her work with these groups, Redden gleaned important insights about pornography's effect on sex offenders. First, Redden surmised that "the viewing of pornography can cause deviant sexual arousal which 'primes' the offender before committing sexual abuse against his or her victim(s)." *See* Redden Aff., Defs.' Ex. N, at ¶ 9(a). Relatedly, Redden found that many sex offenders use pornography to satisfy emotional, psychological and sexual needs that should come from "appropriate sexual partners." *Id.* Those sex offenders' use of pornography reinforces the sex offenders' tendencies to objectify others, including their victims. *Id.* Indeed, Redden testified that allowing those sex offenders to view pornography "completely undermines all the basic tenants of [their] treatment" because "pornography objectifies women" and "it's really essential for someone to objectify and dehumanize someone before they can harm them." *Ortiz* Trial Tr., Doc. No. 79, at 100:12–101:5. From all of this, Redden concluded: "[T]he primary thread for all offenders I've worked with . . . is their exposure and their use of pornography." *Id.* at 104:21–105:2. Relatedly, Redden also learned that the sex offenders in her group therapy "often complained" about the prevalence of pornography in the DOC facilities

because they felt they "could not get away from it." Redden Aff., Defs.' Ex. N, at ¶ 9(b); *Ortiz* Trial Tr., Doc. No. 79, at 101:14–23.

Redden also warned that the continuing prevalence of sexually explicit materials in DOC facilities led to an unacceptably high risk of sexual violence. Redden explained that sex offenders "are more likely than non-criminals to perform sexual acts after viewing pornography." *See* Redden Aff., Defs.' Ex. N, at ¶ 10. Redden cited both her own experience and a study by Gert Hald, Neil Malamuth, and Carlin Yuen (the "Malamuth Study") in concluding that there is "a correlation between problem sexual behavior and the viewing of nonviolent pornography." *See id.* at ¶¶ 10–11. And Redden warned that predatory inmates "will use pornography to create a sexualized environment to then pursue and attempt to exploit a more vulnerable inmate into sexual behavior." *Ortiz* Trial Tr., Doc. No. 79, at 102:6–15; *see also id.* at 126:16–17 (discussing such grooming); Trial Tr., Doc. No. 155, at 423:8–18 (Hartnett). Indeed, the United States Department of Justice's National Institute of Corrections has warned that an inmate's using pornography personally and to barter with and manipulate other inmates is one indication that that inmate may be a predator. *See* Guidebook, Pl.'s Ex. 59.

Redden extrapolated from her experience with sex offenders to develop views about the general inmate population. For instance, Redden testified that pornography is bad for all inmates because both sex offenders and general population inmates "have very sexist and inappropriate attitudes and perceptions of women" and pornography reinforces those attitudes and perceptions. *See Ortiz* Trial Tr., Doc. No. 79, at 100:18–24; *see also* Redden Aff., Defs.' Ex. N, at ¶ 12 (reporting that "[a] correlation has also been found between hostility and negative attitudes towards women and the viewing of pornography"). However, Redden was unaware of "any

study of the effects of pornography on the incarcerated population of any prison system." Trial Tr., Doc. No. 154, at 249:21–24.

The plaintiffs produced Dr. Robert Selverstone, a psychologist and sex educator who was qualified as an expert in "human sexuality and typical human behavior." *See* Trial Tr., Doc. No. 155, at 346:25–347:2. Dr. Selverstone opined that viewing sexually explicit materials has "either neutral or positive" effects on people because doing so facilitates sexual arousal, which is a "normal human function." *See id.* at 350:8–17. Dr. Selverstone similarly believed that masturbation has a positive effect on an individual's mental well-being because masturbation is a form of "self-soothing," "self-control," and "stress release," and it has a positive physiological, hormonal effect. *See id.* at 350:23–351:6. Dr. Selverstone concluded that if one's opportunity to masturbate declines, "the resulting frustration might lead one to be more angry and . . . to engage in behavior that would be potentially antisocial." *Id.* at 371:11–16. Dr. Selverstone noted that research showed an *inverse* relationship between the availability of sexually explicit materials and sexual crimes. *See id.* at 354:24–356:19 (citing "Pornography, Public Acceptance and Sex-Related Crime: A Review," an article by Milton Diamond published in the Journal of Love and Psychology in 2009). Dr. Selverstone noted also that research showed a positive correlation between the availability of sexually explicit materials and positive attitudes towards women. *See id.* at 357:15–358:24 (citing "Voluntary Exposure to Pornography and Men's Attitudes Toward Feminism and Rape," an article by Kimberly Davies published in the Journal of Sex Research in 1997). Dr. Selverstone did acknowledge that "a minority of articles" supported the opposite conclusion. *See id.* at 359:9–360:6.

III.    **Discussion**

Prisoners do not forfeit all their constitutional rights upon incarceration. However, the fact of incarceration and the needs of the prison system impose limitations on prisoners' constitutional rights, even those derived from the First Amendment. *Jones v. North Carolina Prisoners' Union*, 433 U.S. 119, 125 (1977). Indeed, a prisoner retains only "those First Amendment rights that are not inconsistent with his status as a prisoner or with the legitimate penological objectives of the corrections system." *Giano v. Senkowski*, 54 F.3d 1050, 1053 (2d Cir. 1995) (citing *Jones*, 433 U.S. at 125); *see also Florence v. Bd. of Chosen Freeholders of County of Burlington*, 566 U.S. 318, 326 (2012) ("[A] regulation impinging on an inmate's constitutional rights must be upheld 'if it is reasonably related to legitimate penological interests.'") (quoting *Turner v. Safley*, 482 U.S. 78, 89 (1987)). When reviewing prison policies and practices, the federal courts must exercise judicial restraint and significant deference because courts do not have the expertise that corrections officials do in the difficulties of operating a detention center. *See Florence*, 566 U.S. at 326; *Giano*, 54 F.3d at 1053; *Overton v. Bazzetta*, 539 U.S. 126, 132 (2003) (collecting cases).

The Supreme Court directs the courts to review prison policies that impact constitutional rights under a reasonableness standard. A prison regulation should be upheld "if it is reasonably related to legitimate penological interests." *Safley*, 482 U.S. at 89. In *Safley*, the Court set forth four factors to consider in evaluating the reasonableness of a prison regulation: (1) whether there is a valid and rational connection between the prison regulation and the legitimate government interest proffered to justify it; (2) whether the prisoner has an alternative means of exercising his constitutional right; (3) the impact that accommodating the prisoner's constitutional right would have on correction staff, other inmates, and the allocation of prison resources; and (4) whether there are ready alternatives to the prison regulation. *See id.* at 89–91.

The first factor "looms especially large." *Amatel v. Reno*, 156 F. 3d 192, 196 (D.C. Cir. 1998). With respect to the first factor, the question "is not whether the regulation in fact advances the government interest, only whether the [governmental body] might reasonably have thought that it would." *Amatel*, 156 F.3d at 199. The policy must also be neutral, meaning that it furthers a legitimate governmental interest unrelated to the suppression of expression. *See Thornburgh v. Abbott*, 490 U.S. 401, 415–16 (1989). The burden is "not on the State to prove the validity of prison regulations but on the prisoner to disprove it." *Overton*, 539 U.S. at 132. The prisoner must prove that the prison regulation is not reasonably related to a legitimate penological interest—that is, that the regulation is irrational. *See Giano*, 54 F.3d at 1054.

Other courts analyzing prison regulations banning sexually explicit materials have applied the *Safley* factors, and the parties here agree that the *Safley* factors provide the correct framework for analyzing the 2012 ban. In this case, the Defendants put forth either three or four interests promoted by the 2012 ban: (1) the 2012 ban promotes safe and secure correctional facilities; (2) the 2012 ban promotes inmate rehabilitation; (3) the 2012 ban enhances a less offensive and non-hostile workplace; and, possibly, (4) the 2012 ban prevents inappropriate behavior. *See* Defs.' Proposed Conclusions of Law, Doc. No. 120, at 10. As noted above, although the first three goals are consistently cited throughout the evidence in this case, the Defendants cite the fourth goal—to "prevent inappropriate behavior"—sporadically. Other courts have recognized that the Defendants' first three asserted goals are legitimate penological interests. *See, e.g.*, *Thornburgh*, 490 U.S. at 415 (security); *Pell v. Procunier*, 417 U.S. 817, 823 (1974) (rehabilitation); *Mauro v. Arpaio*, 188 F.3d 1054, 1059 (9th Cir. 1999) (en banc) (protecting guard safety and reducing sexual harassment).

I conclude that the 2012 ban is rationally related to the first three legitimate goals that the Defendants put forth. Thus, I need not consider the Defendants' sometimes-asserted fourth interest of "preventing inappropriate behavior."

A. *Safley* Factor One: Valid and Rational Penological Interest

1. Safety and Security

The Defendants believed the 2012 ban would help improve the safety and security of DOC facilities. One way in which the 2012 ban might do so regarded shakedowns. Testimony indicated that during cell shakedowns before 2012, inmates hid contraband inside sexually explicit publications: They believed corrections officers would be less likely to look through those publications thoroughly "because of their embarrassment, disgust, humiliation, or because it was not sanitary to do so." Semple Aff., Defs.' Ex. L, at ¶¶ 18–20; *see also* Dzurenda Aff., Defs.' Ex. P, at ¶ 7; *Ortiz* Trial Tr., Doc. No. 80, at 180:13–181:23 (Hartnett). Testimony also indicated that female corrections officers were particularly disinclined to search thoroughly through inmates' sexually explicit materials, and so the presence of sexually explicit materials made it more difficult for female corrections officers to do their jobs.

Another way in which the Defendants believed the 2012 ban might help improve the safety and security of DOC facilities regarded bartering. Some testimony indicated that before 2012 inmates bartered sexually explicit materials. *See, e.g.*, Trial Tr., Doc. No. 155, at 277:24–278:1 (Vivo); *Ortiz* Trial Tr., Doc. No. 79, at 81:4–8 (Ortiz); *Ortiz* Trial Tr., Doc. No. 80, at 161:22–165:4 (Hartnett). Other testimony explained that bartering can lead to fights that endanger the safety and security of both corrections officers and inmates. *See* Trial Tr., Doc. No. 156, at 543:2–8 (Rivera).

A third way in which the Defendants believed the 2012 ban might help improve the safety and security of DOC facilities concerned the connection between the pervasiveness of sexually explicit materials and inmates' aggression, particularly towards female corrections officers. Corrections officials discussed how before 2012 inmates used sexually explicit materials to make them uncomfortable, such as by posting those materials in visible places in their cell and by forcing corrections officers to search through that material to look for contraband. *See Ortiz* Trial Tr., Doc. No. 80, at 251:20–252:16 (Rinaldi); Trial Tr., Doc. No. 155, at 331:13–332:9 (Smalls). Redden's testimony also cited psychological studies—including the Malamuth Study—that find a direct correlation between viewing pornography and aggression. *See* Redden Aff., Defs.' Ex. N, at ¶ 10. Finally, testimony indicated that availability of sexually explicit materials might increase the risk of inmate-on-inmate sexual assault because "predators" often use pornographic materials to "groom" their victims. *See* Trial Tr., Doc. No. 154, at 191:21–24 (Redden).

The Plaintiffs argued that all the Defendants' asserted interests were irrational. For instance, the Plaintiffs disputed that banning sexually explicit publications would result in more thorough shakedowns. Indeed, Smalls testified that inmates would never hide contraband inside sexually explicit materials because they *wanted* corrections officers to look at those materials rather than thoroughly shake down their cells. *See* Trial Tr., Doc. No. 155, at 332:3–8. The Plaintiffs also contested the Defendants' rationale that banning sexually explicit publications would reduce the threat of bartering those materials. The Plaintiffs argued that bartering for sexually explicit materials has gotten worse since the 2012 ban—and that that was the only logical forecast of what would happen. Indeed, Captain Rivera testified that the price of sexually explicit pictorial depictions has gone up since the nudity ban. *See* Trial Tr., Doc. No. 156, at

544:9–11 (sexually explicit magazines valued at $60 to $100 worth of commissary at the time of trial).

Further, the Plaintiffs disputed that the purported connection between viewing sexually explicit materials and aggression could justify the 2012 ban. The Plaintiffs attacked Redden's testimony, in part, on the basis that she misinterpreted the results of the Malamuth Study and disregarded other studies. *See* Trial Tr., Doc. No. 154, at 240:9–245:8; 248:15–249:17 (Redden). In addition, Dr. Selverstone testified about studies supporting a positive correlation between viewing sexually explicit materials (and masturbation) and calmness and respect towards women. *See* Trial Tr., Doc. No. 155, at 357:15–358:24. Several inmates also testified that the inmate population, in their view, has become more aggressive toward female corrections staff since the 2012 ban because they no longer have the sexual outlet of their pornographic magazines. *See, e.g.*, Trial Tr., Doc. No. 155, at 288:13 (Vivo saying harassment is worse now); *id.* at 320:22–321:3 (Smalls describing the atmosphere as "more aggressive"). Finally, regarding the Defendants' rationale that the availability of sexually explicit materials might reduce safety and security because "predator" inmates might use it to "groom" victims, the Plaintiffs pointed out that "lots of guys look at pornography," and that "doesn't mean they're going to rape their cell mate." *See* Trial Tr., Doc. No. 154, at 235:22–236:1 (Redden).

I conclude that—although some of the Defendants' asserted rationales are weak—the Plaintiffs have not shown that there was no reasonable connection between the 2012 ban and the goal of promoting safety and security in DOC facilities. The Defendants' asserted rationale regarding shakedowns is strong. On either the Defendants' or the Plaintiffs' theory, the presence of sexually explicit materials in DOC facilities makes it more likely that a corrections officer conducting a shakedown will miss something the officer otherwise might have caught. On the

Defendants' theory, corrections officers would not look through those materials as closely as they should because of embarrassment, disgust, humiliation, or because it was not sanitary to do so. On the Plaintiffs' theory, corrections officers would not look through an inmate's entire cell as closely as they should because the sexually explicit materials distracted the officers. Thus, even on the Plaintiffs' own theory, there is a rational connection between the 2012 ban and increasing safety and security.

I agree with the Plaintiffs, though, that there is no rational connection between the 2012 ban and the goal of improving safety and security through decreased bartering. As clearly acknowledged at trial—and as the most rudimentary supply-and-demand economics would have predicted—the underground price of sexually explicit material in DOC facilities has risen since the 2012 ban. That price increase makes it much more likely that bartering of sexually explicit materials will cause fights because inmates are more likely to fight over large debts than over small debts. Beyond that, the Defendants did not produce evidence specifically linking bartering of sexually explicit materials to fights. Testimony did indicate that (1) in general, debts owed as a result of bartering can cause fights, and (2) "teasing," "taunting," and needling about inmates' family members' or girlfriends' physical attributes can also cause fights. *See Ortiz* Trial Tr., Doc. No. 80, at 271:2–9 (Rinaldi). But the Defendants did not link any specific violence to bartering sexually explicit materials. *See, e.g.*, *id.* at 264:8–265:14; 271:2–17 (Rinaldi). For those reasons, the Plaintiffs have satisfied their burden of showing that there was no rational connection between the 2012 ban and the goal of improving safety and security through decreased bartering.

The Defendants' asserted rationale that the 2012 ban would improve safety and security because viewing sexually explicit materials is positively correlated with inmates' aggression is

reasonable, even if I do not find the Defendants' argument to be particularly convincing. Redden and Dr. Selverstone's testimony demonstrated the lack of consensus in the field of psychology regarding the correlation between viewing pornography and an individual's aggression.

That lack of consensus is not enough for Plaintiffs to carry their burden so long as there is sufficient evidence to support the Defendants' view as rational. *See Waterman v. Farmer*, 183 F.3d 208, 216–17 (3d Cir. 1999) (explaining that "the appropriate question is not whether the theories advanced by either party's experts are 'more reasonable' and 'more convincing,' but instead whether" the connection between the regulation and the legitimate state interest is rational). Both Redden and Dr. Selverstone's testimony establish that numerous psychologists find a positive correlation between viewing pornography and aggressive behavior. *See Ortiz* Trial Tr., Doc. No. 79, at 124:9–22 (Redden citing Malamuth Study); Trial Tr., Doc. No. 155, at 359:13 (Selverstone acknowledging "a minority of articles" supporting Redden's view); *see also Amatel*, 156 F.3d at 198–201 (citing studies on both sides of this question and finding that inconclusiveness to support rationality of the prison ban at issue).

Besides the moderate support that conflicting social science provides to the Defendants, other factors also contribute to the reasonableness of the Defendants' stated rationale. First, perhaps due to the inconclusive nature of social science on this question, other courts have cited "common sense" in upholding the rationality of similar prison regulations. *See, e.g.*, *Amatel*, 156 F.3d at 199 (explaining that "conformity to commonsensical intuitive judgments is a standard element of both reasonableness and rationality" and finding that "[c]ommon sense tells us that prisoners are more likely to develop the now-missing self-control and respect for others if prevented from poring over pictures that are themselves degrading and disrespectful"); *Waterman*, 183 F.3d at 217 (citing *Amatel*, 156 F.3d at 199). Second, in this trial, several female

corrections officials testified about the connection they perceived between the pervasiveness of sexually explicit materials and inmates' aggressive behavior towards them. *See, e.g.*, *Ortiz* Trial Tr., Doc. No. 80, at 251:23 (Rinaldi testifying about the "very sexually charged environment").

Finally, I find reasonable the Defendants' asserted rationale that the 2012 ban might improve safety and security by reducing the amount of inmate-on-inmate sexual violence. Even though the Plaintiffs are no doubt correct that not every inmate who looks at pornography is likely to rape his cell mate, it is reasonable for the Defendants to have believed that the availability of pornographic material would make it easier for predators to sexually assault other inmates. *See* Guidebook, Pl.'s Ex. 59 (reporting that prison predators frequently use pornography to "manipulate other inmates").

For the above reasons, I conclude that at least two of the Defendants' asserted rationales for why the 2012 ban would help increase the safety and security of DOC facilities are rational.

2. Rehabilitation

The Defendants' second asserted goal in implementing the 2012 ban was that the ban promoted inmate rehabilitation. Numerous courts have explained that rehabilitation of inmates is a legitimate penological interest. *See O'Lone v. Estate of Shabazz*, 482 U.S. 342, 348 (1987) (citing *Procunier*, 417 U.S. at 822–23). Some courts have upheld prison bans on sexually explicit materials based on a reasonable connection between the ban and the goal of rehabilitation of *all* prisoners. *See Amatel*, 156 F.3d at 198–201 (citing conflicting academic authority and common sense); *Ramirez v. Pugh*, 486 F. Supp. 2d 421, 430–33 (M.D. Pa. 2007). Other courts have undertaken a more exacting analysis. Because "rehabilitation" is a large and amorphous goal, those courts have explained that defendants must link the challenged regulation to a "specific rehabilitative goal" with "particularity." *See Ramirez v. Pugh*, 379 F.3d 122, 129

(3d Cir. 2004).  In *Ramirez*, for instance, the court was quick to draw a distinction between rehabilitation of sexual offenders and non-sexual offenders.  With respect to sexual offenders, the *Ramirez* court explained, courts generally agree that there is a clear, common-sense connection between limiting the availability of sexually explicit materials and the rehabilitative goal of preventing sex crimes and violence against women.  *See id.* at 129.  But courts do not share that consensus with respect to non-sexual offenders.  *See id.*

The Defendants here clearly assert that the 2012 ban was rationally related to the legitimate penological interest of rehabilitating sex offenders because "[c]onvicted sex offenders are more likely than non-criminals to perform sexual acts after viewing pornography."  Redden Aff., Defs.' Ex. N, at ¶ 10.  Redden admitted that her view that pornography was "bad for the rehabilitation" of inmates was "focused particularly on sex offenders."  *See* Trial Tr., Doc. No. 154, at 156:25–157:4.  And Redden further admitted that she knew of no study "that shows any association between viewing pornography and non-sex crimes."  *See id.* at 230:2–7.  In contrast, the Defendants have not put forth a clear argument that the 2012 ban was reasonably related to the goal of rehabilitating the *general* inmate population.  (Essentially the only evidence relevant to that point was the Defendants' contention that there is a direct correlation between viewing sexually explicit materials and hostility towards and objectification of women.  *See, e.g.*, Redden Aff., Defs.' Ex. N, at ¶¶ 11–12 (citing Malamuth Study).)  Instead, the Defendants argue that the 2012 ban's wide scope is justified by the virtual impossibility of confining the flow of sexually explicit materials to only *some* inmates.  That is, if non-sexual offenders could possess sexually explicit materials, no doubt sexual offenders would figure out a way to possess them, too.  I discuss that contention below, when evaluating potential alternative measures that the DOC could have taken.

The Plaintiffs argue that the 2012 ban is simply not effective as a rehabilitative measure, even for sexual offenders. The Plaintiffs put forth evidence that, even before the 2012 ban, the national recidivism rate among sexual offenders was extremely low, and the rate among formerly incarcerated prisoners in DOC facilities was even lower. *See* Request for Admission, Pl.'s Ex. 58, at ¶ 4; Study, Pl.'s Ex. 57, at 4; Trial Tr., Doc. No. 154, at 172:25–173:8 (Redden). Plaintiffs further point out that limiting exposure to sexually explicit materials might have detrimental effects on both sex offender and non-sex offender inmates. *See, e.g.*, Pl.'s Proposed Findings of Fact and Conclusions of Law, Doc. No. 116, at 12 (noting that outside prison sexually explicit materials are widely available); Trial Tr., Doc. No. 154, at 170:23–171:2 (Redden acknowledging that some jurisdictions use exposure to pornography as part of the treatment of sex offenders). Because none of the Plaintiffs is a sex offender, the Plaintiffs also argue that the 2012 ban has "a miniscule, if any, rehabilitative purpose as it relates to" them. *See* Pl.'s Proposed Findings of Fact and Conclusions of Law, Doc. No. 116, at 11. Finally, Dr. Selverstone testified that most psychological research indicated a positive correlation between the availability of sexually explicit materials and positive attitudes towards women. *See* Trial Tr., Doc. No. 155, at 357:15–358:24.

I concur with other courts that have accepted the snug means-ends fit between bans on sexually explicit materials and the rehabilitative goal of reducing the likelihood that sexual offenders will commit future sex crimes or violence against women. In this case, both record evidence and common sense support that conclusion. *See* Redden Aff., Defs.' Ex. N, at ¶ 10; *Waterman*, 183 F.3d at 217. The Plaintiffs' argument that the recidivism rate among sex offenders is remarkably low—both nationally and even more so in Connecticut—is a strong point in their favor. However, the fit between the Defendants' asserted goal and the 2012 ban

need not be air-tight; it must only be reasonable. The Defendants' rationale with respect to rehabilitation of sex offenders is reasonable.

To the extent that the Defendants seek to justify the 2012 ban because of their interest in rehabilitating the general inmate population, I find it a much more difficult question. Courts that have found such a connection reasonable have articulated the relevant rehabilitative goal as trying to counteract the effect of pornography, which "tend[s] generally to thwart the character growth of its consumers," including by eroding self-control and respect for others. *See Amatel*, 156 F.3d at 199. The Malamuth Study concluded that there was "a significant overall relationship between pornography consumption and attitudes supporting violence against women in nonexperimental studies," and that "even small significant associations may translate into considerable social and practical significance across larger population samples." *See* Malamuth Study, Defs.' Ex. C5, at 5. In addition, Redden repeatedly mentioned her view that the pervasiveness of pornography throughout DOC facilities led to a general, problematic objectification of women. *See Ortiz* Trial Tr., Doc. No. 79, at 100:12–101:5 ("[P]ornography objectifies women, and many sex offenders, as well as my experience with the general population of inmates have very sexist and inappropriate attitudes and perceptions of women.").

But other parts of the record and the inconclusiveness of social scientific studies suggest that the Defendants' conclusion may not be rational. For instance, Redden repeatedly stressed that her clinical and relevant experience was limited almost exclusively to sexual offenders. *See, e.g.*, Trial Tr., Doc. No. 154, at 188:1–16; Redden Aff., Defs.' Ex. N, at ¶ 7. In addition, the social scientific studies on this issue seem in equipoise. *Compare* Redden Aff., Defs.' Ex. N, at ¶¶ 11–12 (citing Malamuth Study to suggest direct correlation between viewing non-violent pornography and sexual aggression) *with* Trial Tr., Doc. No. 155 at 354:24–356:19, 357:15–

358:24 (Selverstone noting that a majority of social science literature supports an inverse relationship between the availability of sexually explicit materials and sexual crimes and a positive correlation between the availability of sexually explicit materials and positive attitudes towards women); *Payton v. Cannon*, 806 F.3d 1109, 1110–11 (7th Cir. 2015) (collecting relevant studies backing Dr. Selverstone's position).  Even though "undertaking to weigh the competing scholarship would misconceive the judicial role," the fact that the relevant literature is inconclusive naturally leads me to look elsewhere for signs of reasonableness.  *Amatel*, 156 F.3d at 200.  However, because the Defendants do not clearly rely on the rehabilitation of the general inmate population as an asserted rationale for the 2012 ban, I need not take a position on the question.  In sum, I find only that the Defendants' rationale with respect to rehabilitation of sex offenders is reasonable and do not take a position on whether the connection between the 2012 ban is reasonably related to the goal of rehabilitating *all* inmates.

### 3. Enhancing Less Offensive and Non-Hostile Work Environment

This rationale is the Defendants' strongest.  Overwhelming testimony established that before 2012, sexually explicit pictorial depictions were pervasive throughout DOC facilities; that "gunning" was an unfortunately common practice; and that corrections officers—females in particular—felt uncomfortable in the hyper-sexualized atmosphere.  The Plaintiffs do not dispute those facts but suggest that it was unreasonable to believe that banning sexually explicit materials would better the situation.  For instance, the Plaintiffs point out that "gunning" has continued since the 2012 ban.  *See, e.g.*, Trial Tr., Doc. No. 155, at 319:21–24 (Smalls).  Further, even though the number of public indecency tickets—which include "gunning" offenses—has decreased substantially since 2012, *see* DOC Research, Defs.' Ex. BB, the Plaintiffs argue that that decrease was merely a return to pre-2009 levels and, in any event, corresponded to a

reduction of especially problematic inmates at Northern. *See* Trial Tr., Doc. No. 155, at 312:11–21 (Smalls). In addition, some inmates testified that they have begun objectifying corrections officers more *since* the 2012 ban because their sexual outlets—sexually explicit publications—were taken away. *See* Trial Tr., Doc. No. 154, at 27:13–25 (Reynolds). The Plaintiffs also argue that the goal of enhancing a less offensive and non-hostile work environment would have been better pursued through alternative means. That argument is addressed below.

The 2012 ban was rationally related to enhancing a less offensive and non-hostile work environment. Pages of testimony from male DOC employees, female DOC employees, and inmates recounted the ubiquity of sexually explicit materials in DOC facilities before 2012 and the discomfort that it caused corrections officers, especially female ones. It is plainly rational to believe that removing sexually explicit pictorial depictions from DOC facilities would improve the hyper-sexualized environment within those facilities. Indeed, DOC employees have testified that the climate inside DOC facilities has improved. *See, e.g.*, Trial Tr., Doc. No. 156, 522:4–11 (Cournoyer explaining there was a "very positive" climate at Enfield between 2016 and 2018 due to more mutual respect between the inmates and the staff). I need not engage in the debate regarding post-2012 public indecency ticket statistics and the true reason for those decreasing numbers: the efficacy of the 2012 ban is not under consideration. The question is whether it was reasonable *in 2012* for the Defendants to have implemented the 2012 ban because it might enhance a less offensive and non-hostile workplace. There is no question that it was.

4. Neutrality

The first prong of the *Safley* test requires that the policy or regulation at issue be "neutral." As explained above, the neutrality inquiry is much less searching in the prison litigation context than it is outside of a prison's walls. When evaluating a prison regulation, a

policy is neutral if it furthers a legitimate governmental interest unrelated to the suppression of expression. *See Thornburgh*, 490 U.S. at 415–16. The Defendants believe that all their asserted rationales for implementing the 2012 ban are legitimate, and so the 2012 ban is neutral. The Plaintiffs argue that the 2012 ban was not neutral because it was directed at suppressing the expression of inmates' sexuality. Indeed, some evidence indicated that part of the goal in implementing the 2012 ban was to try to contain inmate "arousal" and reduce the amount of exhibitionist masturbation. *See* Redden Aff., Defs.' Ex. N, at ¶ 9(a). The Plaintiffs believe that the Defendants' asserted rationales are merely pretext. However, as I described above, the Defendants have advanced three (at least partly) legitimate penological interests justifying the 2012 ban unrelated to the suppression of expression. Thus, the 2012 ban is "neutral."

B. *Safley* Factor Two: Alternative Avenues for Expression

The question regarding Factor Two is "whether there are alternative means of exercising the right that remain open to prison inmates." *Safley*, 482 U.S. at 90. Defining the right at issue is important because "if the 'right' at stake is defined in terms of the materials excluded by the ban, any regulation will come up short." *Amatel*, 156 F.3d at 201. The relevant right should be viewed "sensibly and expansively," and it should "allow for flexibility in determining what qualifies as another means of expression." *Giano*, 54 F.3d at 1055 (citing *Thornburgh*, 490 U.S. at 417; *Safley*, 482 U.S. at 78). In evaluating a similar prison ban on sexually explicit materials, including frontal nudity, the Ninth Circuit in *Mauro* defined the relevant right as the "right to receive sexually explicit communications." *See Mauro*, 188 F.3d at 1061. Interpreting the Plaintiffs' asserted right "sensibly and expansively," as I must, I agree with that statement of the underlying right asserted here. The Plaintiffs' requests that I construe their asserted right as one

"to receive and possess constitutionally protected publications"[12] is both circular and over-expansive in this posture.

There are alternative avenues for the Plaintiffs to receive sexually explicit communications. One is through the Artistic Exception. By that exception, an inmate may receive any sexually explicit publication that, on the whole, is literary, artistic, educational, or scientific in nature. *See* A.D. 10.7, Defs.' Ex. A, at ¶ 4(N)(1)(g). (I share the Plaintiffs' desire, though, that the MRB interpret the Artistic Exception more broadly.[13]) Another is through sexually explicit *written* materials. Recall that under A.D. 10.7, an inmate may receive sexually explicit written material so long as it does not threaten the "security, good order, or discipline" of a facility by, for instance, depicting sado-masochism, bestiality, child sexual activity, or forceful sexual activity. *See* A.D. 10.7, Defs.' Ex. A, at ¶ 4(N)(1)(g). Thus, inmates may receive both "sexually graphic written notes" and "romantic letters." *See Giano*, 54 F.3d at 1056; *see also Mauro*, 188 F.3d at 1061 (noting the availability of sexually explicit articles and non-nude photographs). Further, inmates testified that televisions in prison occasionally display sexually suggestive television shows and commercials. *See Ortiz* Trial Tr., Doc. No. 81, at 282:1–7 (Ortiz).

---

[12] *See* Pl.'s Proposed Findings of Fact and Conclusions of Law, Doc. No. 116, at 28.

[13] The Defendants admit that the MRB's job of interpreting the Artistic Exception can be extremely difficult and that the MRB takes its job seriously. Still, I agree with the Plaintiffs that the Artistic Exception is perhaps too narrowly circumscribed. For instance, as inmate Pink testified, he ordered *Gentle Birth Choices* by Barbara Harper, R.N. because he "wanted to draw women giving birth." Trial Tr., Doc. No. 154, at 91:5. The MRB rejected *Gentle Birth Choices* presumably because of its pictorial depictions of nudity, and the Director of Security rejected Pink's appeal and said: "Although this publication is considered an educational publication, the pictorial content is unacceptable and serves no penological interest." Letter, Pl.'s Ex. 10. My review of *Gentle Birth Choices* leaves me surprised that it was rejected and found not to qualify for the Artistic Exception. The book contains no full-page pictures; all pages with pictures have text; and the book has an obvious educational (and perhaps artistic) value.

For the above reasons, I conclude that the 2012 ban does not deprive Plaintiffs of their right to receive sexually explicit communications because there are alternative avenues through which the Plaintiffs can exercise that right.

C. *Safley* Factor Three: Effect of Accommodation on Others (Ripple Effect)

The third *Safley* factor is the impact that accommodating the prisoner's asserted constitutional right would have on correctional staff, other inmates, and the allocation of prison resources. "When accommodation of an asserted right will have a significant 'ripple effect' on fellow inmates or on prison staff, courts should be particularly deferential to the informed discretion of corrections officials." *Safley*, 482 U.S. at 90. This factor is "in part a restatement of the deferential balancing called for under the first factor." *Amatel*, 156 F.3d at 201. The Ninth Circuit has explained that "[t]his factor requires us to determine the impact of allowing inmates unrestricted access to sexually explicit materials." *Mauro*, 188 F.3d 1061.

The Plaintiffs hardly mount an argument regarding this factor beyond pointing out that under *Safley* the "ripple effect" must be "significant." *See* Pl.'s Proposed Findings of Fact and Conclusions of Law, Doc. No. 116, at 29–30. However, *Safley* instructs only that when the ripple effect of accommodating a right will be "significant," the district just should be "particularly deferential" to the Defendants. *See Safley*, 482 U.S. at 90.

I conclude that accommodating the Plaintiffs' asserted right to receive sexually explicit communications would have a significant ripple effect on fellow inmates and prison staff. As described above in my analysis of the first *Safley* factor, before the 2012 ban, sexually explicit pictorial depictions were pervasive throughout DOC facilities. Accommodating the inmates' asserted right at that time affected safety and security by, for instance, leading to less-than-thorough shakedowns; it affected rehabilitation of sex offenders (in particular), even if sex

offenders were not the ones ordering the explicit materials; and it created a hostile work environment for many corrections officers, particularly female ones. All those effects had a significant impact on correctional staff, other inmates, and the allocation of prison resources. Thus, the third *Safley* factor is satisfied.

D. *Safley* Factor Four: Ready Alternatives

The final *Safley* factor asks me to assess whether the Plaintiffs have proved that there are "obvious, easy alternatives to the policy." *See Giano*, 54 F.3d at 1056. "This is not a 'least restrictive alternative' test." *Safley*, 482 U.S. at 90. "[I]f an inmate claimant can point to an alternative that fully accommodates the prisoner's rights at *de minimis* cost to valid penological interests, a court may consider that as evidence that the regulation does not satisfy the reasonable relationship standard." *Id.*

The Plaintiffs point to multiple different alternatives that, they believe, the DOC could have pursued rather than enacting the 2012 ban to achieve the same goals. The first was a two-tiered system in which "inmates would be allowed to possess pictorial depictions of nudity (i.e., similar to those found in publications such as *Playboy* magazine), but would not be permitted to possess the depictions of explicit sexual activity that commonly are found in the facilities today." Garnett Aff., Defs.' Ex. O, at ¶ 7. In fact, the committee *did* consider that alternative because Commissioner Arnone instructed them to. *See id.* However, as explained above, the committee decided that that type of partial ban would not work because its implementation "would require an ongoing, subjective monitoring system to determine what materials would be allowable," the system "would be difficult—if not impossible—to codify and would, therefore, result in an inconsistent implementation of the policy," that "would be financially costly and labor intensive." *Id.* at ¶ 16.

45

The second alternative that Plaintiffs point to is a two-tiered system in which a full ban on sexually explicit materials (including nudity) would apply to sex offenders, but not to non-sex offenders.  As discussed above, the Plaintiffs point out that the penological interest of rehabilitation is much more clearly linked to the rehabilitation of sex offenders than non-sex offenders.  *See* discussion at III.A.2.  Again, though, the committee considered that approach and reasoned that it was not a feasible alternative.  First, even if a sexually explicit publication enters a DOC facility with an intended recipient, "it is reasonable to expect that the material will be circulated among the other prisoners."  *Ramirez*, 486 F. Supp. 2d at 429 (citing *Thornburgh*, 490 U.S. at 412).  Because sexually explicit publications will no doubt be bartered, sex offenders could obtain those publications.  *See id.* ("[P]reventing the general population from receiving pornographic materials such as *Playboy* and *Penthouse* . . . helps prevent sex offenders from receiving such materials.").  The only way to clearly prevent sex offenders from possessing sexually explicit materials is through a full ban.  *See Ortiz* Trial Tr., Doc. No. 80, at 269:1–5 (Rinaldi).  Second, enacting such a two-tiered system would "mark" certain inmates as sex offenders.  Sex offenders are exposed to unique risks in correctional facilities and, when they are known, they are disproportionately targeted for assaults.  *See id.* at 247:2–9 (Rinaldi).  Even though many sex offenders are already known to be sex offenders through prison gossip, marking sex offenders "officially" would lead to an unacceptable risk to their security.  *See id.* at 246:17–23 (Rinaldi).

The Plaintiffs also argue, generally, that many of the problematic behaviors that precipitated the 2012 ban were already proscribed by prison regulations and could have been either elevated in seriousness or enforced more stringently.  For instance, Plaintiffs say, if a concern was the pervasive display of sexually explicit "hardcore" pictorial depictions,

corrections officers could have simply ticketed more for that behavior because it was already against the rules to hang those depictions in public view. However, some testimony established that before 2012, "some inmates were ticketed hundreds of times a year" for having "hardcore" porn hung up in public view. Trial Tr., Doc. No. 154, at 154:16–155:4 (Redden). It was not feasible for corrections officers to write tickets for every such violation because it might require "writing thirty tickets a day, which interfered with their regular duties." *Id.* at 155:13–23.

Plaintiffs also argued that if the Defendants were so concerned about bartering, they could have elevated it from a Class B offense to a Class A offense, which, as described above, carries a more significant potential penalty. *See id.* at 178:2–17 (Redden acknowledging that the committee could have recommended that but did not). Similarly, Plaintiffs argued that if the Defendants were concerned with "gunning," they could have either raised the classification of public indecency from a Class A offense to an elevated Class A offense (thus treating it like an assault on a corrections officer) or increased the punishments to the greatest extent allowed by current regulations. *See* Trial Tr., Doc. No. 156, at 535:18–536:19 (Cournoyer). And Plaintiffs suggested that if the Defendants were concerned with inmate-on-inmate sexual violence, they could have more aggressively referred sexual assaults for prosecution. *See* Trial Tr., Doc. No. 154, at 165:7–11 (Redden). Those arguments, too, fall flat. For one, simply elevating already-existing punishments would not address all the Defendants' asserted legitimate penological interests, such as rehabilitation of sexual offenders and enhancing a non-hostile work environment. Second, the Defendants could have rationally believed that the threat of increased existing punishment was not a significant deterrent for inmates who, for instance, repeatedly "gunned down" corrections officers in the face of then-existing punishments. *Cf. Ybanez v. Raemisch*, 2018 WL 2994416, at *10 (D. Colo. June 14, 2018).

The fact that numerous other correctional systems employ similar bans on sexually explicit publications is further evidence that there are no obvious, easy alternatives to the 2012 ban at issue here. Recall that before settling on the 2012 ban's scope and language, the committee "researched policies adopted by other states and the Federal Bureau of Prisons ["BOP"], and reviewed the historical and current case law from other state and federal courts." Garnett Aff., Defs.' Ex. O, at ¶ 10. Deputy Commissioner Rinaldi remarked that the BOP is "sort of the gold standard" in prison systems because it is so large: according to Rinaldi it has something like "120 prisons and over 200,000 inmates." *See Ortiz* Trial Tr., Doc. No. 80, at 257:22–258:6. The BOP enforces a similar ban on sexually explicit pictorial material, which includes nudity. *See Amatel*, 156 F.3d at 194 (describing the Ensign Amendment and its implementing regulation, 28 C.F.R. § 540.72). In *Amatel*, the D.C. Circuit Court of Appeals upheld the constitutionality of the Ensign Amendment's implementing regulation. *See id.* And I have already noted elsewhere that numerous "[c]ircuit and district courts that have addressed similar bans on sexually explicit materials and publications have upheld those bans as reasonably related to legitimate penological interests." *Cooke v. Deschaine*, 2016 WL 3580796, at *3 (D. Conn. June 28, 2016) (collecting cases).

For the above reasons, I find that the Plaintiffs have not proven that there exists an obvious, easy alternative to the 2012 ban that fully accommodates their rights at *de minimis* cost to valid penological interests.

E. Overbreadth

In the prison litigation context, courts have noted that overbreadth challenges have limited—or no—import. The Third Circuit has gone as far as to say that a court may simply ignore overbreadth challenges in favor of the *Safley* test because an overbreadth challenge would

be "both redundant and inconsistent with" *Safley*.  *Waterman*, 183 F.3d at 212–13.  Other courts have noted simply that "applying overbreadth analysis makes little sense in the prison context where the right of free speech is curtailed."  *Bailey v. Stover*, 766 F. App'x 399, 402–03 (7th Cir. 2019).  When courts do address prisoner plaintiffs' overbreadth claims, they seem to do so within the framework of the *Safley* factors.  *See, e.g.*, *Amatel*, 156 F.3d at 201–02 (noting that overbreadth concerns "seem[] to us captured in part by the demand for a rational relation between the regulation and the goal, and by consideration of alternatives under the fourth 'factor'").

I agree that an overbreadth analysis in the prison litigation context is of little independent importance because the *Safley* analysis essentially encompasses the concerns present in an overbreadth challenge.  I have already determined that the 2012 ban satisfies the *Safley* factors. In doing so, I believe that I have also explained why the 2012 ban is not overbroad.  The Plaintiffs' most attractive argument for overbreadth, it seems to me, regards the DOC's decision to implement a full ban on sexually explicit materials rather than a ban simply on sex offenders. However, as I explained, even though the Plaintiffs are not themselves sex offenders, the Plaintiffs did not prove that adopting a two-tiered system that treated sex offenders and non-sex offenders differently was an "obvious, easy alternative" to the 2012 ban.

F.  Vagueness

A regulation "is unconstitutionally vague if persons of common intelligence must necessarily guess at its meaning and differ as to its application, or if it fails to give a person of ordinary intelligence fair notice of conduct proscribed or required by the regulation, and encourages arbitrary and erratic behavior on the part of the officials charged with enforcing the rule."  *Giano*, 54 F.3d at 1057 (internal citations omitted).  As with overbreadth challenges, some

courts hold vagueness challenges subsumed by the *Safley* factors in the prison litigation context. *See, e.g.*, *Waterman*, 183 F.3d at 212–13.  However, other courts engage with a prisoner plaintiff's vagueness challenge in these circumstances.  *See, e.g.*, *Giano*, 54 F.3d at 1057; *Mauro*, 188 F.3d at 1060 n.5.

In most ways, the 2012 ban is obviously not vague.  For instance, the 2012 ban is a bright-line rule in that it bans "any visual depiction of sexual activity or nudity."  The 2012 ban then defines sexual activity as "includ[ing] but [] not limited to:

- sexual intercourse, including genital-genital, oral-genital, or oral-anal contact, whether between persons of the same sex or opposite sex, with any artificial device, or any digital penetration;
- bestiality;
- masturbation;
- sadistic or masochistic abuse;
- depiction of bodily functions, including urination, defecation, ejaculation, or expectoration;
- conduct involving a minor, or someone who appears to be under the age of 18; and sexual activity which appears to be non consensual, forceful, threatening or violent[.]

A.D. 10.7, Defs.' Ex. A, at ¶ 4(N)(1)(g)(1).  And the 2012 ban (revised in 2014) defines "nudity" as "the visual depiction or display of genitalia, pubic region, anus, or female breast where the areola is visible and not completely and opaquely covered."  Revision to A.D. 10.7, Defs.' Ex. B. Even though the 2012 ban does not lay out an exhaustive definition of "sexual activity," it gives enough examples that persons of ordinary intelligence will not be confused about its meaning. And the 2012 ban sets out a bright-line rule for "nudity."  For the same reasons, there is no question that the 2012 ban gives people of ordinary intelligence fair notice of what the regulation bans.  That conclusion is buttressed by the year-long phase-in that the DOC undertook with respect to the 2012 ban; that phase-in included the DOC's posting four facility-wide notices over the course of that year.  *See* Notices, Defs.' Exs. D, G, H, I.

However, the Plaintiffs advance a non-frivolous argument that the Artistic Exception encourages arbitrary and erratic behavior on the part of the officials charged with enforcing the rule. Recall that the Artistic Exception allows sexually explicit materials to be admitted if, "taken as a whole, [they] are literary, artistic, educational or scientific in nature." A.D. 10.7, Defs.' Ex. A, at ¶ 4(N)(1)(g)(1). Evidence in this case established that the members of the MRB considered applying the Artistic Exception to be the most difficult part of their job. *See, e.g.*, Trial Tr., Doc. No. 155, at 437:19–438:2 (Hartnett). And it is undeniable that the presence of the Artistic Exception injects a subjective element to parts of the MRB's determinations. *See, e.g.*, Trial Tr., Doc. No. 154, at 198:18–201:17 (Redden disagreeing with the MRB and Director of Security's decision to exclude a *National Geographic*).

However, I find that the Artistic Exception is not unconstitutionally vague, either facially or as applied to the Plaintiffs. First, numerous other corrections systems employ a similar exception. *See, e.g.*, 28 C.F.R. § 540.72(b)(3) ("Publications containing nudity illustrative of medical, educational, or anthropological content may be excluded from this definition.") (BOP); MN-DOC Policy No. 301.030 (banning materials containing nudity but exempting published material that depicts nudity illustrating medical, educational, or anthropological content) (Minnesota);[14] Virginia Dep't of Corrections Operating Procedure No. 803.2(IV)(N) (explaining that "[p]ublications containing nudity illustrative of anthropological, educational, or medical content may be acceptable").[15] Although the cases upholding bans with Artistic Exceptions (or their equivalent) do not often squarely discuss the vagueness concern raised here, the fact that all those bans were upheld as constitutional is significant. *See, e.g.*, *Smith v. Fabian*, 2012 WL

---

[14] Available at http://www.doc.state.mn.us/DocPolicy2/html/DPW_Display_TOC.asp?Opt=301.030.htm (last visited Mar. 2, 2020).

[15] Available at https://vadoc.virginia.gov/files/operating-procedures/800/vadoc-op-803-2.pdf (last visited Mar. 2, 2020).

1004982, at *1 (D. Minn. Mar. 26, 2012) (upholding an earlier version of MN-DOC Policy No. 301.030); *Fauconier v. Clarke*, 257 F. Supp. 3d 746, 752 (W.D. Va. 2017) (upholding an earlier version of Virginia Dep't of Corrections Operating Procedure No. 803.2).

Second, "[a] regulation may produce seeming inconsistencies, but what may appear to be inconsistent results are not necessarily signs of arbitrariness or irrationality." *Fauconier*, 257 F. Supp. 3d at 761 (citing *Thornburgh*, 490 U.S. at 417 n.15) (internal quotation marks omitted). That is exactly the case here. Although the Plaintiffs assert that publications are reviewed arbitrarily and inconsistently, the evidence in this case confirmed that the MRB attempts to produce as much consistency as possible when applying a difficult standard. For instance, the MRB catalogs the outcome of every single review so that it can ensure consistency, at least on a publication-by-publication basis. *See* Spreadsheet, Pl.'s Ex. 27.

Finally, it would be an odd result to hold that the Artistic Exception was unconstitutionally vague. Because I have already held the 2012 ban constitutional under the *Safley* analysis (and probably would even without the Artistic Exception), the result for the Plaintiffs would be *worse* if I held for them on this point. In other words, the 2012 ban would become a complete ban on sexually explicit pictorial depictions and nudity, full stop. Thus, I hold that the Artistic Exception is not unconstitutionally vague. For all the above reasons, the 2012 ban is not unconstitutional under the First or Fourteenth Amendments, either facially or as applied to the Plaintiffs.

G. <u>State Law Claims</u>

In addition to their federal constitutional claims, the Plaintiffs have brought two state-law claims. The first asserts that the 2012 ban violated rights guaranteed by Art. 1, Sections 4 and 5 of the Constitution of the State of Connecticut. *See* Second Am. Compl., Doc. No. 110, at ¶¶

54–55.  Those sections of the Connecticut Constitution provide for liberty of speech and the press and prohibit laws limiting those liberties.  The Plaintiffs ask me, based on those provisions, to "[d]eclare" the 2012 ban to be in violation of their rights secured by the Connecticut Constitution.  *See id.* at Demand for Relief, ¶ C.  The Plaintiffs' second state-law claim asks me for a "declaratory judgment" asserting that the 2012 ban was promulgated in violation of Conn. Agencies Regs. Sections 18-81-28 through 18-81-39 and the Connecticut Uniform Administrative Procedures Act.  *See id.* at ¶¶ 56–60; Demand for Relief, ¶ D.

I cannot address the Plaintiffs' state law claims; rather, I dismiss them without prejudice to re-filing them in state court.  The Plaintiffs have asked for the remedy of a declaratory judgment on their two state-law claims.  A declaratory judgment is prospective relief.  *See Marcavage v. City of New York*, 689 F.3d 98, 103 (2d Cir. 2012).  The Prison Litigation Reform Act and on-point Second Circuit authority prevent me from granting prospective relief to inmate plaintiffs solely based on state law claims.

"Prospective relief in any civil action with respect to prison conditions shall extend no further than necessary to correct the violation of the Federal right of a particular plaintiff or plaintiffs."  18 U.S.C. § 3626(a)(1)(A).  A "civil action with respect to prison conditions" is defined as "any civil proceeding arising under Federal law with respect to the conditions of confinement or the effects of actions by government officials on the lives of persons confined in prison."  18 U.S.C. § 3626(g)(2).  This case is a civil proceeding arising under federal law, and it regards the impact of actions by government officials on the lives of inmates.  Thus, prospective relief in this case "shall extend no further than necessary to correct the violation of the [Plaintiffs'] Federal right."  I have held that the Plaintiffs are not entitled to any relief on their federal claims.

I do not have supplemental jurisdiction over the Plaintiffs' state-law claims.  Normally, I could exercise supplemental jurisdiction over the Plaintiffs' state-law claims because they are so related to the federal claims in this action that "they form part of the same case or controversy." 28 U.S.C. § 1367(a).  However, the Second Circuit has held that 18 U.S.C. § 3626(a)(1)(A) impliedly repealed 28 U.S.C. § 1367(a) in part.  *See Handberry v. Thompson*, 446 F.3d 335, 344–46.  Thus, I am "not permitted to order prospective relief to remedy an asserted violation of state law only."  *Id.* at 346.  Because I have held that the 2012 ban did not violate the Plaintiffs' federal rights under the United States Constitution, any prospective relief that I might grant the Plaintiffs on their state-law claims would remedy only state-law violations.  Thus, I dismiss the Plaintiffs' state-law claims without prejudice.

IV.    **Conclusion**

For the foregoing reasons, the 2012 ban does not violate the Plaintiffs' rights under the First and Fourteenth Amendments to the United States Constitution.  Judgment shall enter for the Defendants on counts one and two of the second amended complaint.  The Plaintiffs request prospective relief on their state-law claims, but I cannot order prospective relief on those claims; thus, I dismiss counts three and four of the second amended complaint without prejudice.


So ordered.

Dated at Bridgeport, Connecticut, this 9th day of March 2020.


/s/ STEFAN R. UNDERHILL
Stefan R. Underhill
United States District Judge